IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


DAARON McADOO                                                                                      PLAINTIFF

    v.                                         Civil No. 6:13-cv-06088

SERGEANT AMY MARTIN; and
OFFICER BEN CASH                                                                                DEFENDANTS


**MEMORANDUM OPINION**

This is a civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis*.

Plaintiff's claims arose during his incarceration in the Hot Spring County Detention Center (HSCDC) from February 21, 2013, to June 14, 2013, at which time he was transferred to the Arkansas Department of Correction (ADC). *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1. Plaintiff is currently incarcerated in the ADC, Wrightsville Unit.

Plaintiff asserts the following claims: (1) failure to protect; (2) excessive force; and (3) denial of medical care. The claims all stem from an altercation Plaintiff had with another inmate on May 27, 2013.

On August 1, 2016, a bench trial was held. At the conclusion of Plaintiff's presentation of evidence, Defendant was granted judgment as a matter of law on the failure to protect claim.

At the conclusion of the trial, the two remaining claims were taken under advisement pending preparation of this opinion. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

**1. Background & Evidence Presented**

The following is a summary of witnesses' testimony and the Court's findings of fact:

When Plaintiff was booked on February 21, 2013, an intake screening form was completed. Although his inmate booking sheet, *Defts' Ex.* 1, indicated that Plaintiff was hospitalized following a car accident during which he had fainted or had a head injury, Plaintiff testified that he was in a car accident but suffered no injury and did not see a doctor.

On May 22, 2013, Benjamin Cash began working at the HSCDC. He testified that he had not been working in any type of law enforcement for fourteen months prior to his being hired. He did have past experience working at the ADC for two years and at Saline County Detention Center for seven months. While at the ADC, he attended the training academy and received training on the use of force and inmate policies and procedures. Prior to the incident at issue in this case, he had received no training at the HSCDC. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 6.

Plaintiff was housed in D-pod because he was awaiting transfer to the ADC. On Monday, May 27, 2013, at approximately 8:49 p.m., Plaintiff and Inmate Duddles were involved in an altercation. *Defts' Ex.* 3. Deputy Cash testified that he and Deputy Ellis were in the control tower looking down into D-pod. They saw Plaintiff pacing and yelling. Deputy Cash went down to the pod and asked if everything was alright. Plaintiff responded that "everything's cool man we're straight."

Deputy Cash returned to the control tower and observed that Plaintiff continued pacing, yelling, and striking the tables with his fist. Deputy Cash returned to the pod and as he walked into the pod he saw Plaintiff in an aggressive stance with his fist closed. The two inmates began to hit each other. Deputy Cash testified he ordered the inmates to stop fighting. Deputy Cash indicates that Inmate Duddles quit fighting but that Plaintiff did not.

Deputy Cash testified that Plaintiff was hovering over Inmate Duddles striking him with a

closed fist. Plaintiff's side was turned toward Deputy Cash. Deputy Cash stated that he told Plaintiff to stop fighting three times. Deputy Cash testified he grabbed Plaintiff by the waist, took him to the floor, and placed his knee on the Plaintiff's back. There were about twenty inmates in the pod. Plaintiff was not handcuffed because he complained of his shoulder hurting.

According to Deputy Cash, he used the minimum amount of force necessary to bring an end to the altercation. Deputy Cash contends the use of force was necessary to maintain order and protect Plaintiff, himself, and others. Deputy Cash pointed out that the officers were out numbered by the inmates. Because of this, Deputy Cash testified he tried to put an end to the altercation before it escalated.

Deputy Cash testified he called Sergeant Martin and reported that the Plaintiff appeared to be hurt and was complaining of shoulder pain. Deputy Cash indicated that Plaintiff began complaining of shoulder pain as soon as he hit the floor. Plaintiff appeared to be in a lot of pain.

Deputy Cash's incident report provides:

> At this time I Deputy Cash had Deputy Ellis open the D-pod door, as I Deputy Cash entered D-pod I witnessed Inmate McAdoo and Inmate Duddles exchanging punches, I Deputy Cash gave both inmates a direct order to stop fighting, both inmates refused my direct order and continued to fight.
>
> At this time I Deputy Cash ran and grabbed Inmate McAdoo in attempt to restrain him, as I Deputy Cash grabbed Inmate McAddo[.] Inmate Duddles stopped fighting but Inmate McAdoo continued to try and fight. At this time I Deputy Cash took Inmate McAdoo to the floor with the minimal amount of force necessary to gain control of Inmate McAdoo. After gaining control of Inmate McAdoo I Deputy Cash escorted him to the booking area and placed him in Holding Cell 1.

*Defts' Ex.* 3. Deputy Cash also submitted a defense action report on which he indicated that Inmate McAdoo' shoulder was injured during the takedown. *Defts' Ex.* 5.

On May 27, 2013, Sergeant Amy Martin[1] was the acting jail administrator. She was not at the jail when the altercation occurred. Instead, she testified she was contacted at home at approximately 8:30 to 9:00 p.m. and informed of the altercation. She was also informed that Plaintiff might be injured. She advised jail personnel to contact the transport officer and have him take the Plaintiff to the hospital.

At the time, Sergeant Martin testified the jail was staffed by only two deputies, Deputy Cash and Deputy Ellis. Sergeant Martin testified that one deputy stayed in the tower at all times while the other deputy stayed up front to book inmates. The jail does have a video system to monitor the inmates but it does not record. Sergeant Martin believed the jail was at capacity--fifty inmates--at the time of the incident.

When the transport officer could not be reached, Sergeant Martin went to the jail. Sergeant Martin testified she lived about twenty to twenty-five minutes from the jail. Once she arrived, she had Deputy Ellis take the Plaintiff to the hospital. By then it was approximately 11:34 p.m. *Defts' Ex.* 6. When Plaintiff returned to the jail, he was wearing a splint to hold his shoulder in place against his body. He also had a prescription for ten hydrocodone tablets to be taken by mouth every four hours, as needed. *Plff's Ex.* 1.

Sergeant Martin testified that Sheriff Ed Hollingworth established the policy that the facility would be narcotic drug free. Instead of narcotic pain relievers, inmates would receive Tylenol and/or Ibuprofen. In Plaintiff's case, Sergeant Martin testified he was put in a one man holding cell to be monitored. Sergeant Martin testified that Plaintiff remained in this holding cell until his transfer to the ADC.

---

[1] At the time of the incident, Amy Martin was a corporal.

Plaintiff received Tylenol or Ibuprofen every four to six hours--four hours if he wanted two tablets and six hours if he wanted four tablets. No log was kept when non-prescription drugs were dispensed. Sergeant Martin testified that Tylenol and Ibuprofen are dispensed frequently and free of charge.

Plaintiff was offered the opportunity to make a statement about the altercation but declined. Inmate Duddles did make a statement. On June 8, 2013, Plaintiff submitted a grievance about the incident. *Defts' Ex.* 12.

Britt Kersh, an ADC inmate, testified that he was in D-pod on May 27, 2013, when Plaintiff and Inmate Duddles "got into it." Kersh testified that Plaintiff and Inmate Duddles were exchanging words and then Deputy Cash came in. At this point, Kersh indicated he thought the incident was over and went to take a shower.

A short time later, Deputy Cash came back in because Plaintiff and Inmate Duddles continued to argue and made aggressive movements. Kersh saw Inmate Duddles back against the wall and put his hands up. Kersh witnessed Plaintiff being taken down and heard Plaintiff's bone hit the ground. Kersh testified that takedowns are pretty forceful and given that the floor is concrete a lot could go wrong. In Kersh's opinion, Deputy Cash just did his job.

Former Deputy Stephen Ellis worked at the HSCDC from March of 2013 until April of 2014. He had approximately three years of experience in law enforcement. Deputy Ellis testified that on May 27, 2013, he was in control of the tower because he was the senior officer on duty. He testified he usually worked in booking. Deputy Cash was doing medication call, checking on inmates, and taking grievances. Deputy Ellis was in the tower during the altercation but could see what was happening through the glass and on the monitor.

According to Deputy Ellis, Deputy Cash entered the pod, yelled loudly for the inmates to stop

fighting, gave a second warning, gave a third warning, and then grabbed the Plaintiff and took him to the ground. Inmate Duddles "scurried" to the wall. The entire incident happened very quickly.

In Deputy Ellis' opinion, Deputy Cash used the amount of force necessary to control Plaintiff and for security purposes. Deputy Ellis testified that it is not uncommon for people to get hurt during a takedown. Deputy Ellis wrote an incident report. *Defts' Ex.* 4.

Deputy Ellis testified that there was some delay in taking the Plaintiff to the emergency room because they needed to have two deputies on duty at the detention center and one deputy to transport the Plaintiff. He waited until Sergeant Martin arrived to take Plaintiff to the hospital. In Deputy Ellis' opinion, the Plaintiff was in severe pain.

When Deputy Ellis and Plaintiff arrived at the emergency room, the Plaintiff was seen right away. In Deputy Ellis' estimation, they were at the emergency room for three to four hours. Deputy Ellis indicated he was required to sign admitting papers that showed the HSCDC would be responsible for the bill. When they returned to the jail, Deputy Ellis gave the papers from the hospital to Sergeant Martin. If there was a prescription with the papers, that was up to the inmate and Sergeant Martin to go over. Deputy Ellis testified the Sheriff's policy was that no narcotic medication of any kind could be administered at the jail.

Plaintiff testified that he and Inmate Duddles "got into it" but he could not recall what their conflict was about. Plaintiff indicated that Inmate Duddles belonged to the Aryan Nation. Deputy Cash testified he had no idea that Inmate Duddles was a white supremacist. Plaintiff stated that he was in a "white pod" with more white inmates than black inmates. Plaintiff testified that Inmate Duddles took his shirt off and was swinging it at him.

At some point, Inmate Duddles fell to the floor. Deputy Cash came into the pod and told them to stop. Plaintiff testified he had already stopped fighting. As soon as Inmate Duddles got up,

Plaintiff testified that Deputy Cash grabbed him by the arm, picked him up off his feet, and slammed him to the floor. Plaintiff testified that he hit the floor really hard and he immediately began experiencing "very bad pain" in his left shoulder. Plaintiff stated he told Deputy Cash not to handcuff him because of his shoulder pain.

Plaintiff testified that at the time he was sixty pounds lighter and that Deputy Cash was "way bigger." It is Plaintiff's belief that Deputy Cash was acting out of spite because the Plaintiff is Black. Inmate Duddles is White.

Plaintiff testified that the deputies kept delaying taking him to the hospital. Plaintiff stated he was told they were going to call Sergeant Martin about the situation. When Sergeant Martin got to the jail, Plaintiff testified he told her that he was in pain. According to Plaintiff, Sergeant Martin believed he was "faking it." Plaintiff testified Sergeant Martin told him he was going to have to wait to go to the hospital. At this point, Inmate Duddles was taken out of the pod and gave a statement. Plaintiff testified he did not make a statement.

When he finally got to the hospital, Plaintiff testified that the medical personnel determined that his shoulder was dislocated. *See Defts' Ex.* 7. The dislocation was treated by placing the humerus, the upper arm bone, back into the socket *Id.* He was discharged with a prescription for hydrocodone, ten 10 mg. tablets, to be taken every four hours as needed for pain, and a shoulder immobilizer. *Plff's Exs.* 1 & 3. At about 2:00 a.m., Plaintiff went back to the jail. Plaintiff testified that the jail had no air conditioner; he was in pain; he couldn't sleep; and, the situation was a "nightmare."

Plaintiff asked for his pain medication. Initially, Plaintiff was told the hydrocodone prescription was being filled. In the meanwhile, Plaintiff was given Tylenol and/or Ibuprofen.

Plaintiff was given a follow-up appointment with Dr. Lorio on May 29, 2013. X-rays revealed "[p]robable avulsion fractures off the humeral head." *Defts' Ex.* 9 at pg. 3. A CT of the left shoulder indicated there was a "comminuted fracture involving the superolateral left humeral head with the fracture extending through the greater tuberosity. There were at least three bony fragments in the anterior glenohumeral." *Id.* at pg. 4.

Plaintiff testified that Dr. Lorio said he needed surgery immediately. Plaintiff advised Dr. Lorio that Tylenol was not working. According to Plaintiff, the doctor, in response, stated that he could not prescribe hydrocodone to Plaintiff. Dr. Lorio did not prescribe any type of pain reliever to the Plaintiff.

Plaintiff had another appointment with Dr. Lorio scheduled for May 31, 2013. However, the appointment was rescheduled because there was no transport officer available. The appointment was scheduled for June 5, 2013. Plaintiff was not seen on June 5th because he refused to sign paperwork stating that he would be liable for all medical expenses incurred as a result of the shoulder injury. Plaintiff felt that the deputy should have signed the paperwork. Sergeant Martin acknowledged that as long as Plaintiff was in the custody of the HSCDC, the detention center was liable for any medical expenses incurred.

According to Plaintiff, Defendants would not arrange for him to have surgery and instead wanted to wait for his ADC commitment papers. After his transfer to ADC on June 14, 2013, Plaintiff testified he had to wait four more months for the surgery. While he was waiting to have surgery, Plaintiff testified he was given Tramadol, a pain reliever. The medication logs indicate he began receiving Ibuprofen on June 16, 2013. In August of 2013, he was prescribed hydrocodone on three occasions and in September he was prescribed hydrocodone once and Tramadol twice.

During the surgery, screws were placed to hold his "arm together." *Plff's Ex.* 5.  Following the surgery, Plaintiff underwent nine months of physical therapy.  Plaintiff testified that his left arm is "damaged for the rest of [his] life."  He indicated he could not reach behind his head with his left arm and cannot lift it all the way up.

### 2.  Discussion

As noted above, two claims remain for decision--the excessive force claim and the denial of medical care claim.  The following are the Court's conclusions of law:

**(A).  Excessive Force**

Plaintiff was in pretrial status on May 27, 2013.  *See Defts' Ex.* 2.  The law is clear that a pretrial detainee cannot be punished.  *See e.g. Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense."  *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

The Supreme Court in *Kingsley v. Hendrickson*, et al, ___ U.S. ____, 135 S. Ct. 2466, 2473 (2015) addressed the standard to be applied in analyzing excessive force claims brought by pretrial detainees.  The Court held that a pretrial detainee need only show that an officer's use of force was objectively unreasonable to prevail on an excessive force claim.  *Id.,* 135 S. Ct. at 2473.  In determining whether a given use of force was reasonable or excessive, the Court said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*.  The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id*.

In this case, Plaintiff was involved in a physical altercation with another inmate. Deputy Cash entered the pod which housed approximately twenty inmates. There was only one other deputy on duty. Under the circumstances, Deputy Cash had to act quickly and decisively. When Deputy Cash ordered the inmates to stop fighting, Inmate Duddles did so and went to the wall. Plaintiff did not stop fighting after several verbal warnings. In fact, he continued to fight even as Deputy Cash was physically pulling the Plaintiff away from Inmate Duddles. Considering the circumstances, the use of force was reasonable.

Plaintiff's reliance on the provision of the use of force policy that says "[f]irst-year-Detention officers should not be authorized to use any type of force until such a time that they have completed the State Mandated Basic Jail Course and/or Basic Law Enforcement Training Course" is unavailing. *Plff's Ex.* 2. The testimony established that Deputy Cash received his training while working for the ADC. Even if Deputy Cash had not received his training, the failure to follow jail policy does not state a claim of constitutional dimension. *See e.g., Meis v. Gunter*, 906 F.2d 364, 369 (8th Cir. 1990).

**(B). Denial of Medical Care**

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.[2] *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious

---

[2] *Kingsley*, 135 S. Ct. at 2470 applies only to excessive force claims. *See e.g. Roberts v. C-73 Medical Director*, No 1:14-cv-5198, 2015 WL 4253796 (S.D.N.Y. July 13, 2015); *Kennedy v. Board of County Commissioners for Oklahoma County*, No 15-cv-398, 2015 WL 4078177 (W.D. Okla. July 6, 2015).

medical needs and (2) that the [officers] actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

In order to show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). Society does not expect prisoners to have unqualified access to health care. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). "Treatment may violate the Eighth Amendment only if it involves something more than a medical judgment call, an accident, or an inadvertent failure to give medical care. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Starbeck v. Linn County Jail*, 871 F. Supp. 2d 1129, 1144 (N.D. Iowa 1994). An "inmate must clear a substantial evidentiary threshold to show the prison's . . . staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson*, 603 F.3d at 449.

Plaintiff contends his rights were violated in the following ways: (1) in the delay in taking him to the hospital; (2) the failure to provide him prescribed pain medication; and (3) in the delay in scheduling surgery.

With respect to the delay in taking Plaintiff to the hospital, while it may have seemed unreasonably long to the Plaintiff, the testimony established that detention center personnel were working on getting additional man power to the jail so that one of the deputies could leave and take the Plaintiff to the emergency room. While Plaintiff was injured, it was not a life threatening condition which would require transport by ambulance or suggest the necessity of leaving a jail containing fifty inmates in the care of a single deputy. No evidence was introduced suggesting the delay adversely affected Plaintiff's condition or prognosis. For these reasons, Defendants are entitled to summary judgment on this claim.

A more difficult question is presented with respect to the handling of the prescription for narcotic pain relievers given the Plaintiff by the emergency room doctor. The decision not to give Plaintiff the physician prescribed medication was based on the policy of the detention center that it was a narcotic free facility. No exercise of medical judgment was involved. Other than the emergency room physician, no person with medical training looked at the particular injuries the Plaintiff had and assessed the amount of pain he was in. *See Dadd v. Anoka County*, 837 F.3d 749, 756 (8th Cir. 2016)(the failure to administer prescribed pain medication constitutes deliberate indifference if decision was not based on medical judgment); *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006)("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference"); *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981)(defendants were liable for a two-days' delay in receiving treatment that resulted in greater pain); *see also, Crooks v. Nix*, 872 F.2d 800, 803 (8th Cir. 1989) (Refusal to provide adequate or

proper pain medication to the plaintiff. There is no affidavit filed by any physician or medical director which contradicts plaintiff's need for pain medication); *Strahan v. Rottnek*, No. 4:13-cv-448, 2015 WL 249448, *5 (E.D. Mo. Jan. 20, 2015) (Doctor had a policy of substituting narcotic pain medication with over-the-counter medication and then applying a stepwise approach to pain medication. "Because Dr. Rottnek's policy was applied to plaintiff without any medical determination regarding plaintiff's medical need for narcotic prescription medication for his chronic pain, the policy had the effect of denying plaintiff medical treatment"); *Grawcock v. Hodges*, No. 1:10-cv-345, 2012 WL 3245977, *3 (N.D. Ind. Aug. 6, 2012)("Strict adherence to a policy that bans narcotic medications raises a question of fact as to whether the denier was deliberately indifferent to a serious medical need and whether having a policy against narcotic medications violates constitutional rights,"); *Estate of Clutters v. Sexton*, No. 1:05-cv-223, 2007 WL 3244437, *10 (S.D. Ohio Nov. 2, 2007) (Policy prohibiting all narcotics results in a denial of medical care where there is no individual determination of the prisoner's medical need for the narcotic prescription); *cf. Prosser v. Nagaldinne*, 927 F. Supp. 2d 708 (E.D. Mo. 2013) (no deliberate indifference when physician determined inmate no longer had a need for pain medication); *Sawyer v. Noble*, 708 F. Supp. 2d 591, 595 (W.D. Vir. 2010)("[P]olicy excluding narcotic pain medical not prescribed by a jail physician does not on its face appear unreasonable").

Here, the policy denies prisoners the right to narcotic pain medication even when prescribed by an emergency room physician. Defendants acted pursuant to this policy in failing to provide Plaintiff his prescription pain medication--hydrocodone. No assessment of Plaintiff's pain level was attempted. No medical judgment was exercised. Their actions amount to deliberate indifference. Clearly, there was a causal link between the policy and the increased pain Plaintiff suffered as a result

of not receiving the prescribed pain medication.[3] As the court in *Franklin v. Dudley*, No. 2:07-cv-2259, 2010 WL 5477693, *7 (E.D. Cal. Dec. 29, 2010) aptly stated: "A blanket policy denying narcotic pain medication to inmates . . . regardless of medical need is unconstitutional. Under such a policy, inmates with serious medical needs requiring narcotic pain medication are denied adequate pain medication. Such a policy demonstrates deliberate indifference to serious medical needs." Plaintiff is entitled to judgment in his favor on this claim.

Finally, with respect to the delay in scheduling the surgery, this does not constitute deliberate indifference to Plaintiff's serious medical needs. The missed appointment was due to a lack of man power and does not establish deliberate indifference on the part of the Defendants. Further, Plaintiff was advised that the surgery would be scheduled if the ADC was unable to accept Plaintiff on an expedited basis.

"[A]n inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995); *see also Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(when inmate alleges that delay in treatment rise to level of Eighth Amendment violation, objective seriousness of deprivation should be measured by effect of delay, and to establish this effect inmate must place verifying medical evidence in record). Plaintiff has submitted no medical evidence establishing the detrimental effect of the delay. He presented no evidence that the delay had an adverse impact on his prognosis. His claim involving the alleged delay in scheduling his surgery therefore fails as a matter of law. Defendants are entitled to judgment in their favor on this claim.

---

[3]Noting that Opiods are stronger and more effective in providing pain relief. http://www.emedexpert.com/compare/opioids-non-opioids.shtml (accessed October 24, 2016).

### (C). Physical Injury Requirement

Defendants maintain they should be granted judgment as a matter of law because Plaintiff suffered no physical injury as required by the Prison Litigation Reform Act (PLRA). Specifically, the PLRA provides that: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §1997e(e)

The provision limits the available damages in the absence of a physical injury but does not preclude a Plaintiff from pursuing a claim. *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004)(The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); *see also Pool v. Sebastian County*, 418 F.3d 934, 942 n.2 (8th Cir. 2005)(Section 1997e(e) presents an issue of damages under the PLRA). The injury need not be significant but it must be more than *de minimus*. *Siglar v. Hightower*, 112 F.3d 191, 192 (5th Cir. 1997).

Here, Plaintiff alleges he suffered severe pain as a result of the Defendants' failure to provide him the narcotic pain medication prescribed by the emergency room doctor. The question is whether suffering pain, only partially relieved by Tylenol and Ibuprofen, from the shoulder injury constitutes a physical injury sufficient to enable Plaintiff to recover damages for his mental pain and suffering under § 1997e(e). Reluctantly, the Court finds it does not. *See e.g., Alexander v. Tippah County, Mississippi*, 351 F.3d 626, 630-31 (5th Cir. 2003)(nausea and vomiting caused by raw sewage on floor of the jail cell was *de minimis*); *Weatherspoon v. Valdez*, No. 3-05-cv-0586, 2005 WL 1201118, *2 (N.D. Tex. May 17, 2005)(experiencing pain and suffering, moderate to severe depression, and mood swings insufficient to establish physical injury); *Morgan v. Dallas County Sheriff Dept.*, No. 3-04-cv-2172, 2005 WL 57282 (N.D. Tex. Jan. 11, 2005)(allegations that he suffered undue pain on

a regular basis as a result of not receiving medication for rheumatoid arthropathy on Fridays and Saturdays 20 times in a three-month time span insufficient to constitute physical injury); *cf. Wagner v. Hartley*, No. 10-cv-02501, 2012 WL 1079185 (D. Colorado March 30, 2012)(physical injury sufficiently alleged when Plaintiff suffered from muscle atrophy, joint pains and aches, repeated and severe migraine or other headaches from the lack of exercise and fresh air and mental and emotional distress); *Bain v. Cotton*, No. 2:06-cv-217, 2009 WL 1660051 (D. Vermont June 12, 2009) (suffering severe chronic pain is sufficient to allege physical injury). Plaintiff is therefore not entitled to recover compensatory damages.

**(D). Damages**

The Plaintiff is entitled to an award of nominal damages in the amount of $1. *Williams v. Hobbs*, 662 F.3 994, 1010 (8th Cir. 2011)("nominal damages are the appropriate means to vindicate constitutional rights whose deprivation has not caused an actual, provable injury, and one dollar is recognized as the appropriate value for nominal damages")(internal quotation marks and citation omitted).

Next, the Court must determine whether an award of punitive damages is appropriate. The twin aims of an award of punitive damages are to: (1) punish an actor for willful or malicious conduct; and (2) to deter future unlawful conduct. *Williams v. Hobbs*, 662 F.3d 994, 1011 (8th Cir. 2011)(*quoting Smith v. Wade*, 461 U.S. 30, 56 (1983)). "In determining whether to award punitive damages in a § 1983 case, the fact finder must, as a threshold matter, find that a 'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id.*

On the facts presented in this case, the Court can make no such finding. Defendants' conduct, while perhaps ill advised, did not exhibit an evil motive or intent or reckless or callous indifference

as is required to award punitive damages. Rather, the Defendants were merely conforming their conduct to a jail policy; a policy that had apparently not been challenged as unconstitutional previously.

**(E). Costs**

In general, the taxation of costs is governed by 28 U.S.C. § 1920. Section 1920 provides for the taxation of costs for, among other things, filing fees. The Court will allow Plaintiff to recover his filing fee as part of the judgment. Plaintiff has paid $311.66 of the filing fee, the Defendant will be directed to pay that amount to the Plaintiff and the remainder of the filing fee, $38.34, to the United States Clerks' Office.

**3. Conclusion**

For the reasons stated, Plaintiff will be awarded a judgment in the amount of $1 in nominal damages, $311.66 in costs, and Defendants will be required to pay the Clerk of Court $38.34 representing the remainder of the filing fee. A separate judgment in accordance with this opinion will be entered.

DATED this 21st day of March 2017.

/s/ Susan O. Hickey
SUSAN O. HICKEY
UNITED STATES DISTRICT JUDGE